Copperhead Coal Company, Inc. v. Commissioner.
Copperhead Coal Co. v. Commissioner
Docket No. 59181.
United States Tax Court
T.C. Memo 1958-9; 1958 Tax Ct. Memo LEXIS 226; 17 T.C.M. (CCH) 30; T.C.M. (RIA) 58009; January 24, 1958
*226 Petitioner, organized to strip mine coal, executed an instrument whereby it purported to buy, and a partnership, until then so engaged, purported to sell, all of the latter's coal-mining machinery and equipment and certain real property, for a total consideration of $1,000,000. The actual value of the tangible assets alone was substantially less than $1,000,000, and the going coal-mining operation of the partnership had substantial intangible value. After the transaction petitioner commenced on the following workday to operate the same coal lands formerly worked by the partners in the same manner as had been done by the partners. It received leases to the coal lands owned by the partners and to those formerly leased by them from others. The partnership had so improved the lands as to materially facilitate coal mining thereon. The two active partners became co-managers of petitioner. Held, on the facts, petitioner purchased a going business and not merely tangible assets. The tangible assets are found to have had a fair market value of $650,000, and the intangible value of the business is found to have been worth at least $350,000. All interested parties were aware of such values, *227 and $350,000 of the purchase price is allocable to such intangible value. Petitioner's basis in the tangible assets is reduced pro rata from that claimed by it. Held, further, petitioner has failed to prove erroneous the rates of depreciation applied by respondent to the tangible assets. Thomas F. Callahan, Esq., Hanna Building, Cleveland, Ohio, and Ira W. Patterson, Esq., for the petitioner. Frank W. Hardy, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in the income tax of petitioner as follows: Year
Amount
1950
$ 45,201.16
1951
49,351.24
1952
54,584.10
1953
17,459.25
Total
$166,595.75
The issues are (1) whether $1,000,000 purportedly paid solely for certain *228 tangible assets was in fact so paid, or was in fact paid only in part for such assets, and in part for intangible values of a coal-mining and distributing business, and (2) whether respondent erred in his determination of the proper rates of depreciation applicable to the tangible assets. Findings of Fact A stipulation of facts filed by the parties is hereby incorporated as a part of our findings. Petitioner is a corporation organized under the laws of the State of Ohio, with principal office in Canton, Ohio. Its corporation income tax returns for the calendar years 1950 to 1953, inclusive, were filed with the director of internal revenue at Cleveland. In 1943, W.W. and Velma Hoobler, husband and wife, and Otis C. and Ruth German, husband and wife, formed a partnership under the name of Copperhead Coal Company (hereinafter called the "firm"). Its principal activity was the strip mining of coal. The husbands were the active partners. The firm owned part of the lands it mined and held leases to other lands held in trust. Of the two trustees involved in such leases, one was the daughter of the Hooblers and the other the daughter of the Germans. Petitioner was organized on December 9, 1949, to *229 engage in the strip mining of coal. Its authorized capital stock consisted of 600 shares of common stock, each with a par value of $50. Each of six persons paid in $5,000 and received 100 shares, making a total capital investment in petitioner in the amount of $30,000. The six shareholders, the office (if any) held by each, and their relationship to the firm or partners are as follows: Shareholder
Office Held
Relation to Firm or Partners
H. H. Creighton
President
Attorney
W. E. Shell
Vice President
Mine Superintendent
A. J. Triner
2nd Vice President
Maintenance Man
J. E. Fairless
Secretary & Treas.
Bookkeeper
Claude Pressler
None
Son-in-law of the Hooblers
Charles German
None
Son of the Germans No changes in shareholding or in officers have occurred. Petitioner's principal business activity has at all relevant times been the production and distribution of coal. An instrument dated January 2, 1950 (hereinafter called the "agreement"), was executed between the partners, doing business as Copperhead Coal Company, as sellers, and petitioner as buyer, and reads in part as follows: "That the sellers, in consideration of One Million Dollars ($1,000,000.00) *230 to be paid by the purchaser, and of the promises and agreements of the purchaser, hereinafter contained, do for themselves, their heirs and assigns, hereby agree to sell to the purchaser, its successors and assigns, the following described real estate, personal property, and for the price set opposite each respective item, described as follows: "1. Real Estate described as follows: Situated in the Township of Wayne, County of Tuscarawas and State of Ohio, known as and being a part of Lot No. 23 in the First Quarter of Township 9 and Range 4, and bounded and described as follows: Beginning on the line between Lots Nos. 23 and 24, at the southwest corner of said Lot No. 23; thence south 89 deg. and 45feet east on the south line of said Lot No. 23, a distance of 954.94 feet to a point which is the true place of beginning for this description; thence south 89 deg. and 45feet east on the said line a distance of 550.00 feet to the center line of State Route No. 93, at a point where the line between Wayne and Sugarcreek Townships intersects the center line of said Road; thence north 6 deg. and 15feet east on the center line of said road a distance of 735.3 feet to a point on the north line *231 of lands of the said grantors; thence north 89 deg. and 23feet west along said north line a distance of 200.00 feet; thence south 31 deg. and 00feet west a distance of 849.00 feet to the place of beginning, containing six and 32/100 acres, more or less. Including the coal tipple and
all buildings located thereon
$ 200,000
2. 1 Monighan Shovel #2
160,000
3. 1 Monighan Shovel #1
170,000
4. 3 pumps
5,000
5. 1 Manitowoc
30,000
6. 2 Portable Welders
1,200
7. 1 McCarthy Drill
8,000
8. 1 Air Compressor
10,000
9. 1 I-R Wagon Drill
4,000
10. 1 Adams Grader
4,500
11. 3 D 8 Caterpillars
75,000
12. 1 Allis Chalmers Bulldozer
4,500
13. 1 Howe Scales
5,000
14. 1 Railroad Tipple
5,000
15. 1 Unloader
1,000
16. 1 Case Loader
5,000
17. 1 Lincoln Welder
2,750
18. 1 Hough Payloader
10,000
19. 1 Marion Shovel
70,000
20. 1 Northwest 80D
75,000
21. 1 International Bottom (C30
Welders)
1,000
22. 1 International Dump C 60
(McCarthy Drill)
2,500
23. 1 International Dump D 35
2,000
24. 1 International Dump D 70
5,000
25. 1 International Dump D 70
(Compressor Truck)
5,000
26. 5 International K 11
45,000
27. 1 Ford Pickup (Motor only)
400
28. 1 International K 12
10,000
29. 1 Chevy Tank Truck
$ 900
30. 2 Chevy Pickups
4,000
31. 1 Power Saw
1,000
32. Miscellaneous Machinery
77,250
Total
$1,000,000
*232 "The sellers further agree to give possession of said premises to the purchaser on January 1, 1950, 1:00 A.M. and the purchaser shall have the right to commence and continue mining operations, removal and sale of coal, together with any and all easements, rights and privileges of any manner or kind necessary or pertaining thereto for the removal and sale of coal; provided, however, that the payments of the purchase price hereinafter required to be made are made by the purchaser to the sellers on the due date or within ten (10) days thereafter. Upon the payment by the purchaser of the full sum of the purchase price aforesaid in installments as hereinafter provided, together with interest as hereinafter set forth, the sellers will convey said premises to the purchaser by good and sufficient deed of general warranty conveying said real estate free and clear of all encumbrances whatsoever except such as may be caused by the act or fault of the purchaser and excepting taxes and assessments which may become a lien on said premises after January 1, 1950, which taxes and assessments the purchaser assumes and agrees to pay; also excepting all easements of record. The sellers further agree *233 to transfer and deliver title to the personal property hereinbefore described by good and sufficient bill of sale, free and clear from all encumbrances whatsoever." The consideration stated in the agreement was $1,000,000. Each stockholder lent petitioner $15,000 to enable it to make the required down payment in the amount of $100,000. The balance was payable in 72 monthly installments, each in the amount of $12,500. The items set forth in the agreement, the date when each was new, [1] the date when each was acquired by the firm, the cost of each to the firm, the amount determined by respondent to represent petitioner's actual cost, [2] and the remaining useful life of each as of January 2, 1950, as determined by each party to this proceeding, are as follows: [SEE TABLE IN ORIGINAL] The land acquired pursuant to the agreement constituted merely the premises upon which were located the tipple, buildings and other property of a relatively fixed nature. Petitioner did not acquire title to coal lands, but acquired leases to such lands owned by the partners, on terms usual in the industry. Petitioner also received, on like terms, leases to those lands, until then leased by the firm *234 from the aforementioned trustees, to the extent still owned by such trustees. No bonus was paid by petitioner for any lease. Oral negotiations preceded execution of the agreement. No express mention was made of good will or other intangibles, but all interested parties were familiar with the tangible assets and knew their value. After the transaction of January 2, 1950, the firm continued in existence, but apparently did not mine or distribute coal. The two active partners were engaged full time to manage petitioner, each receiving a salary of $500 a month. Both were still so employed when this proceeding was heard. If purchased new, a down payment of 20 to 25 per cent would be required on at least some of the equipment necessary to strip mine coal, with the balance payable in 30 months. A waiting period of 4 to 5 months is required for delivery. On January 2, 1950, petitioner lacked the credit standing necessary to effect the purchase of such new equipment. Petitioner commenced strip mining on January 2, 1950, on the same sites and in the same manner as had been done by the firm through the immediately preceding workday. Petitioner used the same name as the firm, adding "Inc. *235 " thereto. In addition, it used the same personnel, equipment, office, telephone, broker, and furniture and fixtures. At least a substantial portion of the customers of the firm became customers of petitioner, and the same trucking arrangements were utilized. The firm had constructed roads and removed overburden, and the face of the coal was uncovered to some extent. Some coal was ready to be scooped up and taken for processing to the tipple. Electric power, essential for the operation of some of the principal items of machinery and equipment, had been made available. In the transaction of January 2, 1950, neither petitioner nor the partners were under compulsion to act. Both were free to leave the transaction unconsummated if unsatisfactory. Petitioner could not be forced to and did not pay a price for any part of that which it received in excess of fair market value. The terms of the agreement required the appointment of an escrow agent to hold title to the assets. This requirement was not carried out. The agreement also forbade movement of the property from the tipple site or premises where located. In January of 1950 the economic outlook for coal was good. The condition *236 of the machinery and equipment was good, in view of the age and extent of use of many pieces. Large sums had been expended in repair and maintenance thereof, and petitioner continued thereafter to spend substantial amounts for the same purpose. The tipple had been rebuilt in 1948. At the time this proceeding was heard, petitioner's obligation still outstanding in respect of the transaction in question was in the amount of $87,500 plus interest. Each of the tangible assets included in the agreement was entered on petitioner's books at the value assigned to it in that agreement, and such values were used by petitioner as its cost basis in computing depreciation. No intangible values appeared on the books of either the firm or petitioner, with respect to the mining and distribution of coal. In filing its State personal property tax returns for 1951 and subsequent years petitioner reported the assets cited in the agreement at the values set forth therein, and paid the tax computed upon that basis. Petitioner purchased not merely a quantity of tangible assets, but a going business with substantial intangible value. The fair market value of the tangible assets was $650,000 on January 2, 1950, and *237 all interested parties were aware of that fact. Petitioner could not be required to and did not pay for such assets a sum in excess of such fair market value. The remaining $350,000 was consideration for the intangible value of a going business received by petitioner. The actual intangible value of such business was at least equal to that amount. The cost to petitioner of the tangible assets was $650,000. The proportional value of each item is as set forth in the agreement, each such asset having had a fair market value at that time and cost to petitioner in the amount of 65 per cent of the cost ascribed to it therein. Respondent did not err in his determinations of the remaining useful life and rate of depreciation applicable to each asset in controversy. Opinion The issues herein are wholly of fact, and must be resolved on the basis of the record before us. For that reason, precedent is of little value, except as a general guide of factors to be considered. We have seen the witnesses and heard their testimony. We have observed their demeanor on the witness stand and under cross-examination, and have had the opportunity to form judgments at first hand with respect to the weight *238 and credibility of their testimony. It is well established that the form in which a taxpayer chooses to clothe its transactions does not bind the Government for tax purposes. The Government is free to examine the underlying facts and treat the transaction, taxwise, in accordance with such facts, whether or not they comply with the form selected. Cf. Higgins v. Smith, 308 U.S. 473, and Commissioner v. Court Holding Co., 324 U.S. 331, affirming 2 T.C. 531. Had the parties allocated a specific portion of the total consideration to intangible values, it is clear that we would not be bound by their allocation, and would be free to increase or decrease the amount so allocated in accordance with the facts. Sidney V. LeVine, 24 T.C. 147, and Clarence Clark Hamlin Trust, 19 T.C. 718, affd. 209 Fed. (2d) 761. A failure so to allocate is in effect an allocation of zero, and we are not bound to accept it as conclusive even in cases, such as this, where there is no close identity or relationship between vendor and vendee. On the entire record, we find that the transaction in question constituted the sale of a *239 going business, including its intangible values. We find further that the fair market value of the tangible assets transferred was in the amount of $650,000, and that the intangible values were worth no less than $350,000. All persons representing petitioner were aware of such values and did not in fact cause petitioner to pay $1,000,000 solely for assets worth $650,000. We are satisfied that the $1,000,000 represented consideration for the going coal-mining and distributing business of the firm, and that $350,000 thereof is properly allocable to its intangible values. Having found the above facts, we do not deem it necessary to determine specifically whether the intangible value transferred was properly termed good will, going concern value, or something else. The same result follows whatever its characterization, although we note here that it seems to fall well within the definition of good will found in George W. Staab, 20 T.C. 834. It would unduly and unnecessarily encumber the opinion herein were we to explain in detail our various reasons for giving greater or lesser weight to this or that portion of the testimony of each witness, and we will not attempt to do *240 so fully. Certain matters do, however, deserve specific mention, although we wish to emphasize that they were not our sole criteria. A potential buyer had examined the property and premises in the fall of 1949. The quoted price had been $1,000,000. After investigation this person decided in favor of the purchase, but was informed that other commitments had been made. He was called as a witness by petitioner, in an attempt to show that $1,000,000 was not an unrealistic price for the tangible assets. The nature of the questioning on direct examination was such that it would tend to appear therefrom that $1,000,000 was the price attaching to tangible assets alone. However, on cross-examination, it quickly became apparent that this was not the case, and that in fact the partners had offered to sell their coal business as a going operation for the price quoted. The following language makes this clear: "Q. What were you willing to give him for the equipment? "A. Well, that would be an awfully hard answer to make. What I would be willing to give him. However, I will say that after investigating and talking with my attorney and accountant, that we decided that we were interested in the *241 proposition. "Q. What was the proposition? "A. Well, the proposition was to buy the company, the equipment, and the operation." Petitioner makes much of the fact that its State personal property tax returns listed the tangible personal assets at the values it claims here. But the applicable taxing provision (Page's Ohio Revised Code, section 5711.18) [3] expressly requires the listing of such assets at the value set forth in petitioner's books, less book depreciation. Thus, the fact that petitioner's valuation there coincides with its figures in this proceeding is practically worthless. It merely reflects what petitioner states in its books, the accuracy of which is the very point in issue here. We are convinced that petitioner could not have effected the purchase *242 of similar equipment new, due to credit limitations, and that in any event there would be a waiting period of several months before delivery. We are not satisfied that respondent gave those and several other factors favoring petitioner adequate consideration, and have made adjustments accordingly. We are not convinced, however, that petitioner was therefore willing or could be forced by circumstances to buy old machinery and equipment for about one and one-half times its actual value, or that such facts raised its value as high as petitioner would have us believe. That fact, urged by petitioner itself, that neither party was under compulsion to act, militates strongly against such likelihood. And finally, there is nothing in the record to show that petitioner would have been unable to purchase used equipment elsewhere at a price more in line with fair market values, even taking into account in petitioner's favor the location of the machinery and its availability for immediate use. On page 12 of petitioner's brief appears the following: "Shortly after the acquisition of the aforesaid machinery and equipment the petitioner commenced operations of producing and selling coal obtained *243 from leased properties. The leases involved are dated January 5, 1950 and January 31, 1950, and cover coal lands materially different from those previously leased by the partnership. * * *" Examination behind this statement reveals that the record contains six leases by the trustees to the partners, introduced into evidence and marked as Exhibits 7-G to 12-L, inclusive. The lease by the trustees to petitioner, dated January 5, 1950, introduced and marked as Exhibit 13-M, is obviously the first of the two leases referred to in the above-quoted paragraph. It was for a term of 10 years, beginning January 2, 1950. The land specifically described therein constitutes the same lands which are described in three of the six leases to the firm, namely Exhibits 8-H, 9-I, and 11-K, each of which is for a period of 10 years, beginning in one lease on April 15, 1944, and in the other two on January 16, 1945. And the lease to the petitioner dated January 5, 1950, contains the following statement: "It is the express intention of the lessors and the lessee herein to include in the foregoing descriptions all the land and/or coal now owned by the lessors in Sugarcreek and Wayne Townships, Tuscarawas *244 County, Ohio, and Walnutcreek Township, Holmes County, Ohio." The three remaining leases by the trustees to the partners are of land in Wayne Township in Tuscarawas County. It is thus apparent that all land owned by the trust and leased to the partners was leased to petitioner if still so owned in January of 1950, and that the statement in petitioner's brief to the contrary is erroneous. The other lease in favor of petitioner was executed on January 31, 1950, by the partners, and leased land owned by them for a period of 10 years, beginning January 2, 1950. Thus, despite the evasive tactics of certain of petitioner's witnesses when asked on cross-examination whether the firm had cancelled leases in favor of petitioner, and petitioner's attempt on brief to avoid that impression, it is obvious that such cancellations, express or implied, necessarily took place. Evidence of large amounts expended each year for "repairs and supplies" in respect of the machinery and equipment is ambiguous. It was admitted on cross-examination, and is a matter of common knowledge, that old, worn-out, and obsolete equipment tends to require heavy expenditures merely to remain in operating condition. *245 Such expenditures do not add to its value, but are necessary merely to maintain operations and prevent further deterioration. A protest filed and signed by all four partners with respect to the fiscal years 1944 and 1945 actually urges this fact in an attempt to justify a high rate of depreciation. This protest, attesting to the rough usage of many items of equipment listed in the agreement, is totally inconsistent with the present testimony of the male partners, with respect to the value of such assets, in many cases higher than the price of new items. Those inconsistencies do not tend to give us great confidence in the accuracy of petitioner's testimony. It seems that its witnesses' opinions with respect to such matters are flexible, and vary with the needs of the moment. There has been much testimony to the effect that the condition of the machinery and equipment was "good" or even "excellent," but those words are general and relative. An old machine can be in "excellent' condition for its age. But it would not follow that it is therefore worth approximately twice as much as when first purchased several years previously, or, in fact, worth as much as or more than a new machine. *246 Petitioner points to its financial history after the transaction, showing that at the time of the hearing only $87,500 plus interest remained unpaid, and that it had accumulated a surplus of approximately $400,000. This argument, made to support the premise that the tangible assets were really worth $1,000,000, is a two-edged sword. Respondent could with as much logic argue that it proves that petitioner received a going business with substantial intangible values, and not merely dead assets. The significance of high earnings thus depends on prior assumption of the very point in issue, and can prove anything, given the necessary premise. The husbands were the active members of the firm. W. W. Hoobler testified that he felt that he was "slipping a little," and wanted to relieve himself of responsibilities and "lighten the load a little." Otis C. German testified that he and Hoobler intended to get out of the business, that they "weren't going to operate any mines." Such testimony would seem to indicate that they wished to dispose of not merely physical assets, but their entire business operation. From a single vague reference in the record to other businesses conducted by petitioner's *247 vendor - "we had other businesses, but our main business was the mining - coal mining, stripping," petitioner would have us find that this vendor did not sell its business but continued in business after the sale of the machinery and equipment to petitioner and argues from this that no good will could have passed. This, of course, is a complete non sequitur and is practically admitted to be such in petitioner's brief by the statement, "Certainly after the sale of the machinery and equipment to the petitioner corporation the partnership had no further need for any of the foregoing items. [Office lease, telephone number, employees, broker and customers.]" Moreover, the active partners did not retire, but apparently took over active management of petitioner after the transaction and were still so occupied in June of 1957. This seems inconsistent with their claims that they wanted, in effect, to ease their burdens - lay aside their responsibilities - and that their business was not sold because they retained it. We are here concerned with facts, not words, and find that in fact, if not speech, an operating business, including its intangible values, whether denominated good will, *248 going concern value, or anything else, was sold, and that of the total price therefor, $650,000 is allocable to the tangible property transferred and the remaining $350,000 to such intangibles. In the cases upon which petitioner relies (e.g., Ainslie Perrault, 25 T.C. 439; Lee Ruwitch, 22 T.C. 1053), those assets to which the parties allocated the entire purchase price were in fact worth the amount so allocated. We have found as a fact that this was not so here. In Ainslie Perrault, supra, 56 line-traveling coating and wrapping machines were held to have a greatly enhanced value over construction cost by reason of a patent monopoly in the United States. The facts were that these machines could be and were sold abroad at nine or ten times the controlled United States price and, further, that going rental values for the machines in the United States were greatly disproportionate to the controlled selling price. The Perrault brothers (petitioners), who were equal partners, sold these 56 machines to their wholly-owned corporation at the "foreign" price, which transaction was questioned by the Commissioner. In sustaining petitioners' position *249 as to value, the Court stated, l.c. 451: "But the fact that a portion of the value of the machines arises because there is present a patent monopoly is no reason to reduce the value of the machines as such and attribute the reduction to the patent. The Supreme Court, in Susquehanna Co. v. Tax Comm. (No. 1), 283 U.S. 291, has made it clear that where the value of physical property has been enhanced by reason of the presence of an intangible legal interest, nevertheless the enhanced value still adheres to the property. * * *" The obvious distinction between the Perrault and Copperhead Coal situations is that the claimed intangible values in Copperhead Coal are all items which obviously and historically fall into the category of good will or going value, i.e., the machinery was in place and available for immediate use; electric power was available; the machines were tailored to the job at hand, etc. Petitioner characterizes these attributes as "immediate earning capacity" of the machinery and therefore an intangible legal interest enhancing its value just as the patent monopoly did in the Ainslie Perrault case, supra. We will not further labor the obvious distinctions. *250 In addition, other factors existed not directly connected to physical machines, i.e., petitioner's name was strikingly similar to that of its vendor, it retained its vendor's telephone number, customers, brokers, truckers were readily available. All of the above are indicia of good will or going value. Petitioner also places reliance on two Memorandum Opinions of this Court, Addressograph-Multigraph Corp., dated February 5, 1945 [4 TCM 147], and Seaton Publishing Co., dated March 31, 1954 [13 TCM 303], both of which are readily distinguishable on the facts. In the first of the above cases, we found that no good will had in fact passed, that portion of purchase price so ascribed by the Commissioner having been paid for patents, processes, etc. In the second of the above cases, we made the specific finding: "The values ascribed in the agreement to the office furniture and fixtures, the plant equipment, and the land and building set out above represent the fair market value of those items. * * *
"The values therein set forth tallied with the fair market value of those items and the purchase price as thus agreed on was in fact paid over. This is *251 not a case involving inflated or unreal values. * * *" We note here that the parties themselves are not bound by the allocation in the agreement under the exception to the parol evidence rule that evidence aliunde the writing is admissible to show true consideration. Respondent, not a party to the contract and having had no opportunity to negotiate or object as to any of its terms, a fortiori, is not bound by any recitals therein, and this is especially true of those which are self-serving to the taxpayer. To like effect, see Clarence Clark Hamlin Trust, 19 T.C. 718, affd. 209 Fed. (2d) 761, and Haverty Realty & Investment Co., 3 T.C. 161, in which latter case petitioner was allowed to show the true consideration paid for a policy of life insurance later sold by it. In rejecting the Commissioner's argument that the parties were bound by written recitals of the consideration (in corporate minutes and in the assignment), we stated, l.c. 167: "Upon review of the authorities, it is clear that such testimony was properly received in the instant case for the following reasons: (1) The Commissioner was not a party to the original transactions; and *252 (2) the question involved was one of consideration. "The Supreme Court of the United States, almost all of the Circuit Courts of Appeals, and this Court have held that the parol evidence rule can not be invoked by a third party, not a party to the written instrument involved. In the instant case, the United States is a stranger to the contract. It asserts a tax liability, not a claim derived from either party to the contract. "The respondent cites no court case in which * * * it has been held that parol evidence is inadmissible as against a third person not a party to the written instrument. * * *" [Italics added.] As to the proposition that the parties themselves are not bound, see Cabrera v. American Colonial Bank, 214 U.S. 224, and Deutser v. Marlboro Shirt Co., (C.A. 4) 81 Fed. (2d) 139. None of the partners became shareholders in petitioner. Only two shareholders, neither being an officer, are related by blood or marriage to any of the partners. Petitioner has at times stressed the foregoing facts, apparently to prove that the valuation set forth in the agreement was the result of arm's length negotiations between parties with adverse interests. *253 Petitioner misconceives the meaning and significance of "adverse interests" in the specific context of the instant controversy. Granting arguendo an arm's length transaction, it follows that seller and purchaser would be adverse in respect of the total amount to be paid, the amount and time of payment of various installments, rights of one party in case of default by the other, and many other matters of serious concern. It does not follow, however, that the parties would be adverse in allocating an already agreed-upon gross purchase price between tangible assets and intangible values. In fact, the contrary is clearly true. A greater allocation to tangible, here principally depreciable assets benefits petitioner by way of increased deductions for depreciation. Amounts allocated to intangibles would be lost until and unless final disposition of the business occurs. Allocating all consideration to the tangible assets, normally not contrary to the sellers' interests, is here much to their benefit. Nine hundred thousand dollars remained due on the total purchase price. Such allocation, increasing petitioner's earnings by decreasing its income taxes, enhances its ability to pay the *254 amount due, and is therefore very much to be desired by sellers as well as purchaser. Thus, however much the parties may have dealt at arm's length generally, the interests of all of them were identical when the time came to allocate the consideration. In summary, we are satisfied that the assets purportedly sold for $1,000,000 were in fact worth only $650,000, and that only $650,000 out of the $1,000,000 paid for the business purchased is properly allocable thereto. Each tangible item has a cost to petitioner equal to 65 per cent of the amount ascribed to it in the agreement. The second issue is whether respondent erred in the rates of depreciation determined by him to be proper. Both sides have introduced evidence on this issue, and on the entire record we are not able to say that respondent's determination has been demonstrated to be erroneous. While we have not based this conclusion on any one fact, we note that petitioner has failed entirely to prove the amount of salvage value, or that no salvage value exists. We cannot but conclude that petitioner has failed to carry its burden of proof on this issue, and we sustain respondent therein. Decision will be entered under Rule *255 50. Footnotes
1. If known.↩
2. The quoted portion of the agreement contains the amounts claimed by petitioner to represent such actual cost.↩
3. Section 5711.18↩ of Page's Ohio Revised Code reads in part as follows: In the case of personal property used in business the book value thereof less book depreciation at such time shall be listed, and such depreciated book value shall be taken as the true value of such property, unless the assessor finds that such depreciated book value is greater or less than the then true value of such property in money. * * *